IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| AMY HENSON, ) | |
| ) | |
| Plaintiff, ) | Case No. cv-2020- |
| v. ) | |
| ) | |
| WALKER COUNTY, LARRY UNDERWOOD, ) | |
| former Sheriff of Walker County, Individually ) | |
| and in his official capacity, NICK SMITH, ) | |
| Sheriff of Walker County, in his official capacity, ) | |
| WALKER COUNTY COMMISSION, KEITH ) | |
| DAVIS, BOBBY NUNNELLY, STEVEN ) | |
| ADERHOLD, BILLY LUSTER, in their official ) | |
| capacities as members of the Walker County ) | |
| Commission, TRENT McCLUSKEY, former Jail ) | |
| Administrator, individually and in his official ) | |
| capacity, and JOSHUA DILL, in his official ) | |
| capacity, ) | |
| Defendants. | |

## COMPLAINT

COMES NOW Plaintiff, Amy Henson, and for her Complaint against Defendants, Walker County ("County"), Larry Underwood, former Walker County Sheriff ("Underwood"), Nick Smith, Walker County Sheriff, Walker County Sheriff ("Smith"), the Walker County Commission ("Commission"), Keith Davis ("Davis"), Bobby Nunnelly ("Nunnelly"), Steven Aderhold ("Aderhold") and Billy Luster ("Luster"), members of the Walker County Commission, Trent McCluskey, former Walker County Jail Administrator ("Administrator") and Joshua Dill ("Dill"), states:

## PARTIES

1. Plaintiff, Amy Henson, is a female resident of the Western Division of the Northern District of Alabama and is a natural person over the age of 21 years.

2. Walker County is an administrative division of the State of Alabama.

3.      Larry Underwood is a male resident of the Western Division of the Northern District of Alabama and is a natural person over the age of 21 years. At all times relevant to this lawsuit, Underwood was the Sheriff of Walker County, Alabama.

4.      Under Alabama law, Underwood was legally responsible for supervising the Walker County Sheriff's Department, which includes the Walker County Jail ("Jail").

5.      At all times relevant to this lawsuit, Underwood served as the highest-ranking law enforcement officer employed by the County. As such, he created policy for the Sheriff's Department and the Jail and assumed legal and actual responsibility for all day-to-day operations for both the Sheriff's Department and the Jail.

6.      Underwood served as a final policymaker and a final decision maker for all matters described herein necessary to establish County liability

7.      Nick Smith is a male resident of the Western Division of the Northern District of Alabama and is a natural person over the age of 21 years. Smith is the current Sheriff of Walker County, Alabama and, as such, is the highest-ranking law enforcement officer employed by the County and is responsible for all day-to-day operations for both the Sheriff's Department and the Jail.

8.      The Walker County Commission is a governmental body and is comprised of its members and referred to collectively as the "Commission".

9.      The Commission is not a pro forma organization, but instead has substantial duties operating effectively as a division of Walker County, Alabama. The Commission is responsible for the development and management of the County's annual operating budget, approves departmental budgets and oversees spending for County operations, include the budget and operations of the Sheriff's Department and the Jail.

10. Keith Davis is a male resident of the Western Division of the Northern District of Alabama, is a natural person over the age of 21 years and serves in his capacity as member of the Walker County Commission.

11. Bobby Nunnelly is a male resident of the Western Division of the Northern District of Alabama, is a natural person over the age of 21 years and serves in his capacity as member of the Walker County Commission

12. Steven Aderhold is a male resident of the Western Division of the Northern District of Alabama, is a natural person over the age of 21 years and serves in his capacity as member of the Walker County Commission

13. Billy Luster is a male resident of the Western Division of the Northern District of Alabama, is a natural person over the age of 21 years and serves in his capacity as member of the Walker County Commission

14. Trent McCluskey is a male resident of the Western Division of the Northern District of Alabama and is a natural person over the age of 21 years.

15. At all times relevant to this lawsuit, McCluskey served as the Jail Administrator at the Jail. McCluskey received reports of and knew, or should have known, about the wrongs committed against the Plaintiff and other persons incarcerated in the Jail, as described herein, but did not take action to cause those wrongs to cease or otherwise to prevent them from happening in the first instance.

16. McCluskey served as a final decision maker for purposes of whether to take action to protect Plaintiff. McCluskey also served as a de facto policymaker for purposes of establishing County liability.

17.     Jurisdiction over Plaintiff's claims is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), to obtain remedies for the deprivation of rights guaranteed by the Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States, pursuant to the Enforcement Acts as amended and codified at 42 U.S.C. §§ 1983, 1985, and 1986.

18.     The Plaintiff also invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367, for state law claims that arise from the same facts and circumstances from which Plaintiff's federal claims arise.

19.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2), in that the events or occurrences giving rise to Plaintiff's claims occurred in the Northern District of Alabama, Western Division, and in that the acts and omissions about which Plaintiff complains occurred in Walker County, Alabama.

## FACTS

20.     On January 14, 2018, Plaintiff, who was an addict, was under the influence of multiple illicit drugs, when she became incoherent and began experiencing a drug-induced psychosis, which included marked erratic behavior, as well as auditory and visual hallucinations,

21.     When Walker County Sheriff Deputy Dill arrived on the scene, it was clear from Plaintiff's behavior that she was in distress and in urgent need of medical assistance.  In fact, the Complaint prepared by Dill subsequent to the arrest stated that, at the time of the arrest, Plaintiff was "under the influence of alcohol, narcotics or other drugs to the degree that she endangered herself or another or property."

22.     Plaintiff was immediately arrested and transported to the Walker County Jail, where she was charged with two (2) misdemeanors, Public Intoxication and Use/Possession of

Paraphernalia.  Plaintiff was then fingerprinted and booked into the Jail by the Booking Officer on duty.

23. During an arrest, an officer has a duty to seek prompt medical attention and/or transport to the hospital, any individual who appears to have a serious medical condition at the time of arrest.  Although Dill clearly understood that Plaintiff was in crisis and a danger to herself and others, he did not seek medical attention for Plaintiff, but merely handcuffed her, put her in the back of the police vehicle, and drove her to the Jail to be processed, without any regard for her health or safety

24. The Booking Officer at the Jail has a non-discretionary duty to evaluate all individuals that are arrested and brought to Jail, prior to booking, to determine whether they are sound or in of need medical treatment.  The Booking Officer on duty that evening knew, or should have known, based on Plaintiff's behavior and the arresting officer's report, that Plaintiff had a serious medical condition that required urgent medical treatment.

25. Shortly thereafter, Plaintiff was stripped of all clothing, covered with a cloth bib, and placed in an emergency restraint chair, which restrained her arms, legs and waist.   Plaintiff was restrained in the chair for several hours, in a manner contrary to the guidelines set forth by the Alabama Department of Corrections (ADOC).

26. While strapped into the restraint chair, Plaintiff was forced to urinate and defecate on herself. During this time period, no one offered Plaintiff bathroom privileges, and no one approached Plaintiff to clean her off or remove the restraints so that she could clean herself. Plaintiff sat in her own waste for the entire time she was restrained in the chair.

27. During the time period Plaintiff was strapped into the restraint chair, Plaintiff was not evaluated by a medical doctor or licensed mental health professional, as is required by ADOC guidelines for the use of restraints.

28. At the time of the arrest, Plaintiff had multiple drugs in her system including, but not limited to, GHB, Suboxone, and was taking as many as eight (8) Klonopins on a daily basis.

29. Plaintiff began to suffer symptoms of withdrawal while strapped into the restrain chair, including continual vomiting and diarrhea.

30. When Plaintiff was finally released from the chair, she was placed in a cell, where she continued to vomit repeatedly. During the five (5) days that Plaintiff was detained at the Jail, Plaintiff was forced to detox without medical supervision or intervention. Upon information and belief, Plaintiff was also placed on suicide watch while she was at the Jail.

31. During those five (5) days at the Jail, due to the constant vomiting caused by being forced to withdraw cold turkey, Plaintiff was unable to hold anything down and, thus, was unable to ingest any foods or liquids. The only "medical treatment" administered to Plaintiff during this time period was Tylenol. Plaintiff was never evaluated by a medical doctor, nor was she transported to a doctor or hospital for treatment of her potentially life-threatening condition.

32. Upon information and belief, a jailer at the Jail contacted Plaintiff's family and reported that Plaintiff was violently ill and needed immediate medical treatment.

33. Immediately upon being released, Plaintiff's family took her directly to the Emergency Room at Walker Baptist Medical Center, where Plaintiff presented with symptoms including, but not limited to, an altered mental status and visual and auditory hallucinations. None of these serious conditions were treated while Plaintiff was at the Jail.

34. Plaintiff was admitted to intensive care for four (4) days to treat severe hypokalemia (dehydration), leukocytosis and elevated LFT's. While in intensive care, Plaintiff was placed on suicide watch.

35. After being thoroughly evaluated by hospital staff, a CT Scan of Plaintiff's brain was ordered due to her altered level of consciousness, which presented upon admission to the hospital.

36. As Plaintiff's condition continued to deteriorate, she was transferred to the Behavioral Medicine Unit (BMU), where she was evaluated and treated for multiple psychiatric conditions.

37. Plaintiff's final discharge diagnoses from ICU included leukocytosis, elevated LFT's, opioid dependence with withdrawal, benzodiazepine withdrawal, substance-induced psychotic disorder with delusions, psychosis and acute cystitis.

38. After being transferred to BMU and fully evaluated by a licensed mental health professional, Plaintiff was diagnosed with psychotic delusions and depression, substance-induced psychosis, delusions, opioid dependence and withdrawal and benzodiazepine withdrawal, and immediately prescribed antipsychotic and psychotropic medications for her serious mental health issues.

39. Upon release from BMU, Plaintiff was transferred to a Crisis Residential Unit, where she continued to receive psychiatric treatment, for a period of time, until she was stable.

### FAILURE TO PROVIDE ADEQUATE MEDICAL TREATMENT UPON ARREST

40. Plaintiff adopts and incorporates by reference paragraphs 1 through 39 of this Complaint, as if fully set forth herein.

41. Based on the behavior and condition of Plaintiff at the time of arrest, it would have been obvious to any layperson that Plaintiff needed an immediate psychiatric evaluation and/or hospitalization.

42. An arresting officer has a duty to seek prompt medical attention when an arrestee is clearly in crisis or has a serious medical condition.

43. When Officer Dill took Plaintiff into custody, he failed to exercise his duty when he ignored the fact that Plaintiff was critically ill and in need of emergency medical attention and merely handcuffed her and transported her to the Jail to be booked in. Officer Dill's behavior is particularly egregious because, as he noted in his report, Plaintiff was clearly under the influence of some type of illicit substance to the extent that she was a danger to herself or others. Dill's behavior in this situation amounts to deliberate indifference.

### CRUEL AND UNUSUAL PUNISHMENT- IMPROPER USE OF RESTRAINT CHAIR

44. Plaintiff adopts and incorporates by reference paragraphs 1 through 43 of this Complaint, as if fully set forth herein.

45. Plaintiff was seriously deprived of her right to be free from cruel and unusual punishment when she was strapped into the restraint chair for an inordinate amount of time; when the jailers failed to follow ADOC protocol with respect to restraints; by failing to have Plaintiff evaluated by a medical doctor or a licensed psychiatric professional before, during and after the use of the restraint chair; and when Plaintiff was forced to urinate and defecate on herself, then forced to sit in the urine and feces for in inordinate amount of time;

46. It is clear under the circumstances that Defendants in this case acted with deliberate indifference and reckless disregard of Plaintiff's rights.

47.     Defendant had a duty to properly supervise its employees to ensure that they were following the guidelines set forth by the ADOC when using the emergency restraint chair to restrain inmates.

48.     Underwood and McClusky failed to properly supervise its employees to ensure that they were following the guidelines set forth by the manufacturer of the emergency restraint chair.

49.     Underwood and McClusky had a duty to properly instruct and train its deputies, jailers and any other employees as to the proper use of the emergency restraint chair, pursuant to the guidelines set forth by the ADOC for restraining inmates.

50.     Underwood's and McCluskey's failure to properly train and supervise Jail personnel with respect to the safe and appropriate use of the emergency restrain chair is further evidence of the Defendants' deliberate indifference of the rights of Plaintiff.

## FAILURE TO PROPERLY TRAIN AND
## FAILURE TO PROPERLY SUPERVISE JAIL EMPLOYEES

51.     Plaintiff adopts and incorporates by reference paragraphs 1 through 50 of this Complaint, as if fully set forth herein.

52.     Underwood and McClusky had a duty to ensure that all deputies, jailers and other jail staff had adequate training that would enable them to properly assess incoming inmates, especially those with serious medical and/or psychiatric conditions.

53.     Underwood and McClusky failed to properly train its deputies, jailers and other employees to properly assess the medical needs of incoming inmates.

54.     Underwood, McClusky, Dill and the Booking Officer failed to properly assess both Plaintiff's medical condition and psychiatric condition upon booking her into the Jail on January 14, 2018.

55. Based on the aforementioned facts, it would have been obvious to any reasonable person that Plaintiff was in need of immediate medical attention.

56. Defendants' failure to provide Plaintiff with immediate medical attention for her serious conditions was wanton and reckless, and amounted to deliberate indifference.

## FAILURE TO PROVIDE ADEQUATE MEDICAL TREATMENT DURING PRE-TRIAL DETAINMENT

57. Plaintiff adopts and incorporates by reference paragraphs 1 through 56 of this Complaint, as if fully set forth herein.

58. The Eighth Amendment to the U.S. Constitution prohibits "cruel and unusual punishments", which imposes a duty on prison officials to provide adequate medical care, which includes mental health treatment, to prisoners and jail detainees. Pre-trial detainees are protected by the Fourteenth Amendment's Due Process Clause.

59. Section 1983 of Title 42 of the United States Code ("42 U.S.C § 1983") prohibits correctional facilities from depriving inmates of their right to receive adequate medical care while incarcerated.

60. Courts have defined "adequate" medical services as "services at a level reasonably commensurate with modern medical science and a quality acceptable within prudent professional standards.

61. The Defendants were deliberately indifferent to Plaintiff's serious medical condition, in that they knew or should have known that it was dangerous for Plaintiff to detox without medical assistance and disregarded this excessive risk to Plaintiff's health and safety.

62. Deliberate indifference to serious mental health needs violates the Eighth Amendment.

63. Defendants' conduct with respect to their treatment of Plaintiff, i.e., ignoring Plaintiff's serious, potentially fatal medical issues and failing to provide adequate medical care, is not merely negligent, and demonstrates deliberate indifference by the Defendants in this case.

64. A serious medical need is defined as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

65. Defendants at the Jail had actual knowledge of Plaintiff's serious medical conditions. Despite having this knowledge, Defendants failed to provide constitutionally adequate medical care, putting Plaintiff's health and safety at risk.

66. Defendant's deliberate indifference caused Plaintiff to suffer serious physical and psychiatric injuries, in violation of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C § 1997e(e).

67. Defendants' deliberate indifference amounts to a wanton and unnecessary infliction of pain.

## FAILURE TO PROVIDE ADEQUATE FUNDING FOR MEDICAL TREATMENT AND PSYCHIATRIC TREATMENT

68. Plaintiff adopts and incorporates by reference paragraphs 1 through 67 of this Complaint, as if fully set forth herein.

69. had a duty to provide adequate medical treatment and adequate mental health treatment for its inmates.

70. The Commission has a duty to provide the necessary funding for its jail to obtain adequate medical and mental health treatment for those inmates in need.

71. Defendant breached that duty by failing to provide adequate funding for adequate medical care and mental health treatment.

72. Defendant breached that duty by failing to provide adequate funding for qualified medical personnel to treat serious medical conditions, such as those suffered by Plaintiff.

**WHEREFORE**, Plaintiff respectfully prays judgment as follows:

A. For compensatory damages against Defendants in their official capacities as representatives of the County, in an amount to be proven at trial;

B. For exemplary and punitive damages against Underwood and McCluskey in their individual capacities, in an amount to be proven at trial;

C. For injunctive relief against Smith and the Commission, as well as all those acting in concert with them, requiring them to exercise due diligence in hiring practices and to properly train, supervise, and discipline their jailers;

D. For the costs of this suit, including Plaintiff's reasonable attorneys' fees, costs, and expenses;

E. For such further and other relief as the Court deems appropriate.

**Plaintiff Demands a Trial by Jury on all issues so triable.**

Respectfully submitted,

/s/ Michele E. Pate
Michele E. Pate (ASB-4457-E49F)
Law Office of Michele E. Pate
P.O. Box 3391
Jasper, AL  35502
(205) 275-1700
mpatelaw@gmail.com
***Attorney for Plaintiff***

/s/ Andrew C. Allen

Andrew Allen (ASB-3867-E56A)
Law Offices of Andrew C. Allen, LLC
Of Counsel
Fulmer Schudmak, LLC
217 Country Club Park, Box 501
Birmingham, Alabama 35213
(205) 847-5199
aallen@fulmershudmak.com

/s/ Frank Ozment
Frank Ozment (ASB-7203-N73J)
Frank Ozment Attorney at Law, LLC
Of Counsel
Fulmar Schudmak, LLC
217 Country Club Park, Box 501
Birmingham, Alabama 35213
(205) 918-8905
frank@fulmershudmak.com

***Attorneys for Plaintiff***