FILED

2020 Dec-07  PM 01:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# JASPER DIVISION

|                       |     |                  |
|-----------------------|-----|------------------|
| AMY HENSON,           | )   |                  |
|                       | )   |                  |
| Plaintiff,            | )   |                  |
|                       | )   |                  |
| v.                    | )   | 7:20-cv-00071-LSC |
|                       | )   |                  |
| WALKER COUNTY, et al.,| )   |                  |
|                       | )   |                  |
| Defendants.           | )   |                  |
|                       | )   |                  |

### MEMORANDUM OF OPINION

Amy Henson spent five days in the Walker County Jail. She believes her federal constitutional rights were violated during those five days. So she sued multiple individuals and Walker County, Alabama, under 42 U.S.C. § 1983.

Here the Court considers five motions:

- Walker County Sheriff's Deputy Joshua Dill's motion to dismiss for failure to state a claim (Doc. 12);

- Walker County's motion to dismiss for failure to state a claim (Doc. 10);

- Current Walker County Sheriff Nick Smith's motion to dismiss for lack of standing (Doc. 14);

- Former Walker County Sheriff Jim Underwood's motion to dismiss for insufficient process and insufficient service of process (Doc. 28);

- Former Walker County Jail Administrator Trent McCluskey's motion to dismiss for insufficient process and insufficient service of process or, alternatively, for failure to state a claim (Doc. 8).

As explained below,

- Deputy Dill's motion to dismiss for failure to state a claim is due to be granted (Doc. 12);

- Walker County's motion to dismiss for failure to state a claim is due to be granted (Doc. 10);

- Sheriff Nick Smith's motion to dismiss for lack of standing is due to be granted (Doc. 14);

- Sheriff Jim Underwood's motion to dismiss for insufficient process and insufficient service of process is due to be terminated as moot (Doc. 28); and

- The Court reserves judgment on Trent McCluskey's motion to dismiss for insufficient process and insufficient service of process or, alternatively, for failure to state a claim (Doc. 8).

## I.    Henson's Allegations

At this stage, the Court accepts a plaintiff's factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) (citing *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)). Without ruling on their veracity, the plaintiff's allegations are as follows:

In January 2018, one or more men held Amy Henson captive for several days. (Doc. 2 at ¶ 16.) While her complaint doesn't say whether she took drugs voluntary or involuntary, it says she was "under the influence of multiple illicit drugs." (*Id.*) She escaped captivity on January 18, 2018. (*Id.* at ¶¶ 16–17.) Still hallucinating and suffering a drug-induced psychosis, she fled to her neighbor's home and asked for help. (*Id.*)

Walker County Sheriff's Deputy Joshua Dill arrived and found Henson sitting on her neighbor's porch. (*Id.* at ¶¶ 17–18.) Rather than take her to a hospital, Deputy Dill handcuffed her, arrested her, and placed her in the back of his vehicle.[1] (*Id.* at ¶ 20.) In the arrest report, Deputy Dill said Henson was "under the influence of alcohol, narcotics or other drugs to the degree that she endangered herself or another or property." (*Id.* at ¶ 19.)

Deputy Dill drove Henson to Walker County Jail and charged her with public intoxication and use/possession of drug paraphernalia. (*Id.* at ¶ 21.) Jail staff then fingerprinted her, booked her, removed her clothing, and allegedly placed her in an emergency restraint chair "for several hours if not days." (*Id.* at ¶¶ 22, 26.) According to Henson, while restrained she allegedly began showing signs of drug withdrawal. She urinated on herself, defecated on herself, vomited "continually,"

---

[1] Nothing suggests Deputy Dill knew Henson had just (allegedly) escaped captivity.

and was unable to ingest food or liquids. (*Id.* at ¶¶ 27, 32, 33.) Jail staff eventually removed Henson's restraints and placed her in a cell. (*Id.* at ¶ 34.) Henson alleges that no medical professional ever evaluated her. (*Id.* at ¶ 38.) She says the jail offered her only Tylenol. (*Id.* at ¶ 37.)

Although jail staff never took her to a hospital, they contacted her family and allegedly told them she "was violently ill and needed immediate medical treatment." (*Id.* at ¶ 39.) Henson's family retrieved her from jail and took her to the Emergency Room. (*Id.* at ¶ 40.) There, doctors diagnosed her with hypokalemia, elevated liver enzymes, opioid dependence with withdrawals, benzodiazepine withdrawal, substance-induced psychotic disorder with delusions, psychosis, and acute cystitis. (*Id.* at ¶¶ 42–45.) She remained in intensive care for five days where doctors treated her with intravenous fluids and medications. (*Id.* at ¶ 41.) Once Henson's condition stabilized, the hospital transferred her to the Behavioral Medicine Unit (BMU) for psychiatric treatment. (*Id.* at ¶ 43.)

## II.    Standards of Review

### A.    Rule 12(b)(6) Motions for Failure to State a Claim

To withstand a 12(b)(6) motion a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Lord Abbett Mun. Income Fund, Inc. v. Tyson*, 671 F.3d 1203, 1207 (11th Cir. 2012) (quoting

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. The Court next "assume[s] the veracity" of all well-pleaded factual allegations and determines whether those allegations "plausibly give rise to an entitlement to relief." *Id.* Only the complaint itself and any attachments thereto may be considered, even when the parties attempt to present additional evidence. *See Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1168 (11th Cir. 2014); *see also* Fed. R. Civ. P. 12(d).

### B.   Rule 12(b)(1) Motion for Lack of Standing

"Because a motion to dismiss for lack of standing is one attacking the district court's subject matter jurisdiction, it is brought pursuant to Rule 12(b)(1)." *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 807 n.8 (11th Cir. 1993). A 12(b)(1) motion takes one of two forms: a facial attack or a factual attack. *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990). Sheriff Smith's 12(b)(1) motion is a facial attack on Henson's standing. To evaluate Sheriff Smith's facial attack, the Court "examines whether [Henson's] complaint has sufficiently alleged subject matter jurisdiction." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009). This looks much like the 12(b)(6) analysis. "[T]he Court

construes the complaint in the light most favorable to the plaintiff and accepts all well-pled factual allegations as true." *Id.*

## III.   Analysis

### A.   Deputy Dill's Motion to Dismiss

Henson sued Deputy Dill in both his official and individual capacities. (Doc. 2 at ¶ 12.) Her theory is this: because Deputy Dill suspected she was so intoxicated that she endangered herself, he violated the United States Constitution by taking her to jail instead of the hospital. The Court addresses Henson's official capacity claim first and her individual capacity claim second.

#### 1.   Henson's Claim Against Deputy Dill in His Official Capacity is Due to Be Dismissed.

Henson's official capacity claim against Deputy Dill fails as a matter of law. Her complaint seeks injunctive relief against only two defendants, Walker County and Sheriff Nick Smith. By naming these two defendants, her request for injunctive relief impliedly excludes the other defendants (like Deputy Dill). *See Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 80 (2002) ("[E]xpressing one item of an associated group or series excludes another left unmentioned."). And by excluding Deputy Dill from that request for injunctive relief, the Court can only assume she seeks money damages. The Eleventh Circuit has held on multiple occasions that the Eleventh Amendment bars § 1983 claims for damages against Alabama sheriffs and

sheriff's deputies in their official capacities. *Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1525–27 (11th Cir. 1990); *see Welch v. Laney*, 57 F.3d 1004, 1008 (11th Cir. 1995). Because Henson's claim against Deputy Dill in his official capacity seeks only money damages, and because the Eleventh Amendment prohibits that relief, this claim is due to be dismissed.

### 2. Henson's Claim Against Deputy Dill in His Individual Capacity is Due to Be Dismissed.

A 42 U.S.C. § 1983 claim has two elements. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970). "First, the plaintiff must prove that the defendant has deprived [her] of a right secured by the 'Constitution and laws' of the United States." *Id.* Second, the plaintiff must show the defendant acted under color of state law when he or she caused that deprivation. *Id.* The parties don't dispute that Deputy Dill acted under color of Alabama law when he arrested Henson and took her to jail. They do, however, dispute § 1983's first element. Henson says Deputy Dill deprived her of a constitutional right to adequate medical treatment; Dill contends that qualified immunity bars Henson's claim.

Courts conduct a burden-shifting analysis when a defendant asserts qualified immunity. *Penley v. Eslinger*, 605 F.3d 843, 849 (11th Cir. 2010) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). The defendant must first show he was acting within his discretionary authority when the alleged deprivation happened.

(*Id.*) If he succeeds, "the burden shifts back to the plaintiff to show that qualified immunity is not appropriate." *Id.* The plaintiff's burden has two parts. *See generally Pearson v. Callahan*, 555 U.S. 223 (2009) (holding that courts may take the two parts in either order). Part one asks "whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Part two asks whether the alleged constitutional violation was clearly established when it allegedly happened. *Saucier*, 533 U.S. at 201.

### i. Arresting Henson Was Within Deputy Dill's Discretionary Authority.

Deputy Dill acted within the scope of his discretionary authority when he arrested Henson. An official's actions are discretionary if "they are of a type that fell within the employee's job responsibilities." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). Arresting a suspect falls within a sheriff's deputy's job responsibilities. *See, e.g.*, *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). Deputy Dill, therefore, satisfied his burden, and the burden shifts to Henson to show Dill violated a clearly established constitutional right.

## ii.     Deputy Dill Did Not Violate A Clearly Established Constitutional Right.

An official violates a pretrial detainee's constitutional rights if he or she is deliberately indifferent to the detainee's serious medical need(s).[2] *Andujar v. Rodriguez*, 486 F.3d 1199, 1203 (11th Cir. 2007). A deliberate indifference claimant must satisfy three "components." *Goebert*, 510 F.3d at 1326. "First, she must satisfy the objective component by showing that she had a serious medical need. Second, she must satisfy the subjective component by showing that the . . . official acted with deliberate indifference to her serious medical need. Third, as with any tort claim, she must show that the injury [or deprivation] was caused by the defendant's wrongful conduct." *Id.* (citations omitted).

Henson alleges four facts relevant to Dill. First, on the day of her arrest she was hallucinating and acting erratically. Second, Dill arrived and saw her sitting on her neighbor's porch. Third, Dill prepared an arrest report which said Henson was "under the influence of alcohol, narcotics or other drugs to the degree that she

---

[2] "A pretrial detainee's claim of deliberate indifference to a serious medical need falls under the **Fourteenth Amendment's** Due Process Clause." *Watkins v. Pinnock*, 802 F. App'x 450, 454 (11th Cir. 2020) (emphasis added). Henson mistakenly brought her claims under the Fourth Amendment. Upon review, the Court found other cases where litigants mislabeled a serious-medical-need claim. *See, e.g.*, *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) (pretrial detainee mistakenly brought claim under the Eighth Amendment); *Andujar*, 486 F.3d at 1203 n.3 (same). In those, the Eleventh Circuit overlooked the error and analyzed the claim under the proper amendment. This Court does the same here.

endangered herself or another or property." And fourth, Dill "did not seek medical attention . . . but merely handcuffed her, put her in the back of the police vehicle, and transported her to jail to be processed, without any regard for her health or safety."

Henson also alleges several conclusions. She says, "it was clear . . . that [she] was in medical distress and in urgent need of medical assistance" and that Dill "clearly understood that [she] was in crisis." The Court ignores these conclusions. *See Harper v. Lawrence Cnty. Ala.*, 592 F.3d 1227, 1234 (11th Cir. 2010) (the Eleventh Circuit ignored the legal conclusion that jail officials "had full knowledge that [the plaintiff] was an alcoholic who would experience delirium tremens due to alcohol withdrawal if left untreated"). Only well-pled factual allegations deserve the presumption of truth. *Iqbal*, 556 U.S. at 678.

Based on the four relevant facts that Henson alleged, she didn't have an objectively serious medical need when Dill arrested her. An objectively serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994) (internal quotation marks omitted). When Dill arrested Henson, no doctor had diagnosed her or mandated treatment, and she hadn't yet exhibited withdrawal symptoms like vomiting or diarrhea. Even if Dill suspected Henson had taken illegal

and dangerous drugs, "[t]he Constitution does not require an arresting officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol." *Burnette v. Taylor*, 533 F.3d 1325, 1333 (11th Cir. 2008). At the time of arrest, based on the facts Henson alleged, her medical need wasn't so obvious that "even a lay person" would recognize she needed immediate medical attention.

Assuming for the sake of argument that Henson had a serious medical need at the time of her arrest, Dill was not deliberately indifferent to that need. For deliberate indifference, a plaintiff must allege enough facts to raise three elements above the speculative level: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Goebert*, 510 F.3d at 1317 (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)). Henson argues that by taking her jail and not the hospital, Dill was deliberately indifferent. But binding case law belies Henson's argument. In *Mann v. Taser Intern, Incorporated,* deputy sheriffs arrested an "agitated and delusional" methamphetamine addict. 588 F.3d 1291, 1299–1300. The suspect was combative, she screamed, she attempted to kick the deputies, and she accused the deputies of trying to steal her dope. *Id.* The deputies knew the suspect was a meth addict. *Id.* Bystanders even warned the deputies that "she was sick and needed to go to the

hospital instead of jail." *Id*. The deputies ignored that warning and took her to jail. *Id*. at 1300–01. Although the suspect's condition later deteriorated, her deliberate-indifference claim failed as a matter of law. *Id*. at 1308. Because nothing at the time of arrest "evidenced a serious disease rather than a temporary reaction to the known use of methamphetamine," and because nothing suggested "the deputies were aware [her] condition could lead to death if not properly treated," the deputies didn't knowingly disregard a serious risk or act with more than gross negligence. *Id*. Like in *Mann*, nothing suggested to Dill that Henson was having more than a temporary reaction to the use of alcohol or drugs. Therefore, like in *Mann*, taking Henson to jail was not an act of deliberate indifference.

Even if Dill acted with deliberate indifference, he didn't violate a clearly established right. A clearly established right is one about "which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In the Eleventh Circuit, three sources of law put the reasonable person on notice: "specific statutory or constitutional provisions; principles of law enunciated in relevant decisions; and factually similar cases decided by state and federal courts in the relevant jurisdiction." *Goebert*, 510 F.3d at 1330. Although caselaw "does not require a case directly on point for a right to be clearly established," existing law "must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S.Ct.

1148, 1152 (2018) (quoting *White v. Pauly*, 137 S.Ct. 548, 551 (2017)). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.*

Henson was a suspected user of an unknown quantity of an unknown drug; the reasonable officer would not have known that taking her to jail violated the United States Constitution. In fact, the most analogous Eleventh Circuit case cuts against Henson's claim. *See Burnette*, 533 F.3d at 1327–33. In *Burnette v. Taylor*, deputies arrested Buster Burnette for stealing his stepfather's prescription-grade pain patches. *Id.* at 1327–28. The stepfather warned one deputy that "Buster was 'strung out' on pills," and the deputy noticed Buster "had glassy eyes and dilated pupils." *Id.* at 1328. Like here, the deputies suspected Buster had abused drugs. *Id.* Like here, the officers took Buster to the county jail. *Id.* And, like Henson, Buster's symptoms worsened after he got to jail. *Id.* at 1329–30. But based on Buster's condition at the time of arrest, the *Burnette* Court found no deliberate indifference:

> Based upon the assumed facts, we cannot conclude that it was obvious to either Deputy Taylor or Deputy Batten that Buster had a serious medical need . . . The symptoms that Plaintiff alleges Buster was exhibiting at the time of arrest are consistent with the use of drugs or alcohol but not necessarily indicative that medical attention was then required . . . Deputy Taylor and Deputy Batten did not violate the federal law.

*Id.* at 1331. Henson alleged no facts distinguishing her claim against Deputy Dill from Buster's claim against Deputies Taylor and Batten. More importantly, she pointed to no statutory provision or case clearly notifying Deputy Dill that he acted unconstitutionally. Qualified immunity therefore protects Deputy Dill, and Henson's claims against him are due to be dismissed.

### B.    Walker County's Motion to Dismiss

Henson sued Walker County for "failure to provide adequate funding for medical treatment and psychiatric treatment" at the Walker County Jail. In response, Walker County argues Henson's claim is a veiled attempt to hold it responsible for the actions of McCluskey, Sheriff Underwood, and jail staff— something prohibited by *Turquitt v. Jefferson Cnty. Ala.*, 137 F.3d 1285 (11th Cir. 1998). Because Henson pled no factual allegations suggesting Walker County inadequately funded its jail, her claim is due to be dismissed.

A county government faces § 1983 liability only for acts for which it is legally responsible, "acts which the [local government] has officially sanctioned or ordered." *Turquitt*, 137 F.3d at 1287 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80 (1986)). In *Turquitt*, the Eleventh Circuit held that Alabama's county governments are not legally responsible for day-to-day county jail operations. *Id.* at

1288. That responsibility lies with the Sheriff,[3] and "an Alabama sheriff acts exclusively for the state rather than the county in operating a county jail." *Id.* In other words, Alabama local governments are not final policymakers with respect to the operation of county jails. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("[O]nly those municipal officials who have final policymaking authority may by their actions subject the government to § 1983 liability.") (internal quotation marks omitted).

Although Alabama county governments are not legally responsible for day-to-day jail operations, they are responsible for "erecting and maintaining jails." *Turquitt*, 137 F.3d at 1289. If a county's failure to maintain or fund a jail "constitute[s] deliberate indifference to a substantial risk of serious harm to the prisoners," then the county can face § 1983 liability. *Marsh v. Butler Cnty., Ala.*, 286 F.3d 1014, 1027 (11th Cir. 2001). The question here is whether Henson alleged a plausible failure-to-fund claim.

---

[3] "The sheriff has the legal custody and charge of the jail in his or her county and all prisoners committed thereto, except in cases otherwise provided by law. The sheriff may employ persons to carry out his or her duty to operate the jail and supervise the inmates housed therein for whose acts he or she is civilly responsible. Persons so employed by the sheriff shall be acting for and under the direction and supervision of the sheriff and shall be entitled to the same immunities and legal protections granted to the sheriff under the general laws and the Constitution of Alabama of 1901, as long as such persons are acting within the line and scope of their duties and are acting in compliance with the law." Ala. Code. 1975 § 14-6-1.

Henson's complaint has eighty-seven paragraphs, but only five of them pertain to funding. The rest pertain to Deputy Dill, McCluskey, the Walker County Sheriff, and others for whom the county is not legally responsible. The five pertinent paragraphs are:

83. The County had a duty to fund and provide adequate medical treatment and mental health treatment for its inmates.

84. The County is constitutionally obligated to provide the necessary funding for its inmates.

85. The County breached that duty by failing to provide adequate funding for adequate medical care and mental health treatment.

86. The County breached that duty by failing to provide adequate funding for qualified medical personnel to treat serious medical conditions, such as those suffered by Plaintiff.

87. As a result of the inadequate funding, Plaintiff did not receive adequate medical care.

All five are legal conclusions. They recite elements (duty, breach, causation, damages), but "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Henson must allege enough facts to raise her claim above the speculative level. *See id*. She didn't meet that burden. She alleged no facts about the county's budget, its allocation of funds to the jail, or a plan to deliberately underfund the jail. She alleged no facts connecting her mistreatment to a funding shortfall—no facts, for instance, connecting jail

officials' use of the restraint chair or their failure to call medical personnel to a lack of funding.[4] Without those allegations, Henson is asking the Court to hold Walker County liable for the acts of others, and that the Court cannot do. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) ("Respondeat superior or vicarious liability will not attach under § 1983.") (internal citations omitted). Her claim against Walker County is due to be dismissed.

### C.    Current Sheriff Nick Smith's Motion to Dismiss

Nick Smith became Walker County's sheriff after Henson's arrest and time at jail. Jim Underwood, not Nick Smith, was sheriff "at all times relevant to this lawsuit." (Doc. 2 at ¶ 5.) She therefore sued Smith only in his official capacity and only for injunctive relief. (*Id.* at ¶¶ 7, A–E.) She asks:

> For prospective injunctive relief against . . . Smith in [his] official capacit[y] to assure the prevention of like conduct in the future by Defendants and those acting in concert with the Defendants;

> For injunctive relief against Smith . . . as well as all those acting in concert with [him], requiring them to exercise due diligence in hiring practices and to properly train, supervise, and discipline their jailers.

Smith contends that Henson lacks standing to seek her requested injunctive relief.

---

[4] This Court reached the same conclusion in similar cases with similarly unspecific allegations. *See, e.g., Aaron v. Winston Cnty., Ala.*, No. 6:16-cv-01038-LSC, 2017 WL 2719300 at *3 (N.D. Ala. June 23, 2017); *Bell v. Shelby Cnty. Ala.*, No. 2:12-cv-2991-LSC, 2013 WL 5566269 at *3–4 (N.D. Ala. Oct. 8, 2013).

Article III of the United States Constitution limits federal courts' jurisdiction to cases and controversies, U.S. Const. art. III § 2, and "standing is an essential . . . part of the case or controversy requirement." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). A standing analysis asks "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Sims v. Fla. Dep't of Highway Safety & Motor Vehicles*, 862 F.2d 1449, 1458 (11th Cir. 1989). To have standing, the party asserting federal jurisdiction must establish three elements.

> First, [he or she] must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . traceable to the challenged action of the defendant and not . . . the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560–61 (internal citations and quotation marks omitted).

"Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of *future* injury." *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994) (emphasis in original). Stated differently, the plaintiff must show "a sufficient likelihood that [she] will be affected by the allegedly wrongful conduct [again] in the future."

*Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004) (quoting *Johnson v. Bd. of Regents*, 263 F.3d 1234, 1265 (11th Cir. 2001)).

Former jail inmates generally don't have standing to enjoin future jail actions or future jail conditions. In *Dudley v. Stewart*, a jail inmate (Nathaniel Dudley) sought to enjoin a jail's disciplinary procedures. 724 F.2d 1493 (11th Cir. 1984). But mid-suit, Dudley was transferred from the jail to a state penitentiary. *Id.* at 1494. "Since Dudley [was] no longer in the custody of county jail officials, the most that [could] be said for his standing [was] that *if* he . . . [was] convicted of another crime and [was] incarcerated in the Daugherty County Jail, he might [have] again [been] subject to disciplinary confinement without due process." *Id.* The Court found those potentialities too speculative for standing. *Id.* In *McKinnon v. Talladega*, an inmate at Talladega's County Jail sued to enjoin the jail's overcrowding, inadequate internal security, poor lighting and ventilation, inadequate plumbing, unacceptable food, and unsanitary conditions. 745 F.2d 1360, 1362 (11th Cir. 1984). But because he left the jail before his case ended, the Court dismissed his injunctive-relief claim for lack of standing. *Id.* at 1363. Similarly, in *Holland v. Purdy* the former Fifth Circuit dismissed a former inmate's petition for injunctive relief because, as a former inmate, the risk of him suffering future jail-caused injuries was too speculative. 457 F.2d 802, 803 (5th Cir. 1972) ("Since Holland was no longer subjected to the complained-of

conditions at the time this litigation was instituted, nor is he at the present time, the petition should have been dismissed on the ground of mootness."). These Circuit precedents are well-supported by Supreme Court precedents. *See O'shea v. Littleton*, 414 U.S. 488, 496 (1974) (finding no standing when "the prospect of future injury rests on the likelihood that [a plaintiff] will again be arrested for and charged with violations of the criminal law and will again be subjected to" criminal proceedings) ; *City of L.A. v. Lyons.*, 461 U.S. 95, 103 (1983) (reiterating that "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy").

Based on these binding Circuit and Supreme Court precedents, Henson's claim against Smith fails for lack of standing. She was in Walker County's jail almost three years ago, for five days. Nothing suggests she ever was confined there before 2018. Nothing suggests she's been confined there since. So, to paraphrase *Dudley*, Henson will face an injury *if* she again suffers a drug-induced psychosis, *if* then an officer arrests her, *if* that hypothetical officer takes her to Walker County Jail, *if* she then again has drug withdrawals, and *if* then the jail's staff violates her constitutional rights. Such an injury is conjectural or hypothetical, not actual or imminent.

The narrow holding of *Lynch v. Baxley*, 744 F.2d 1452 (11th Cir. 1984) does not, in this case, override the general rule—that former jail inmates cannot sue a jail

or jail officials for prospective injunctive relief. In *Lynch*, a mentally ill plaintiff challenged Alabama's practice of holding an individual in county jail pending his or her civil commitment hearing. *Id.* at 1455–57. Although the plaintiff was not incarcerated when he brought the suit, he was incarcerated twice in the three years before. *Id.* Based on (1) that pattern of incarceration, (2) the plaintiff's "mental problems" which were "subject to reoccurrence," and (3) the high likelihood that "state officials [would] continue to employ the county jails to detain . . . mentally ill individuals awaiting final commitment hearings," the plaintiff "was realistically threatened by a repetition of his experiences and therefore [had] standing." *Id.* According to the Court, the plaintiff was "at risk of [again] being detained in jail not because of volitional acts on his part but because his mental condition would prompt his family, as it [had] done on two previous occasions, to petition for involuntary commitment." *Id.* at 1457.

*Lynch* is distinguishable for three reasons. First, Henson has not alleged a pattern of incarceration. So far as we know, January 2018 was and is the only time she was in custody. Second, assuming Henson took the drugs involuntarily, reincarceration in Walker County's Jail is unlikely. Unlike in *Lynch* where future civil commitment proceedings were likely, nothing suggests Henson will again be held captive and forced to involuntarily consume drugs. If, on the other hand, she took

the drugs voluntarily, that too distinguishes her case from *Lynch*. The purely involuntary nature of the *Lynch* plaintiff's incarceration—mental illness—made it more likely that he would again be incarcerated. But when a plaintiff has a voluntary choice, "it [is] to be assumed that [she] will conduct [her] activities within the law." *Lyons*, 461 U.S. at 103. Henson's threat of future harm is more speculative and less actual/imminent than the plaintiff's in *Lynch*. Her claim against Smith is therefore due to be dismissed.

### D.   Former Sheriff Jim Underwood's Motion to Dismiss

Former Walker County Sheriff Jim Underwood moved to dismiss for insufficient process and insufficient service of process.

Henson's complaint mistakenly named Sheriff Jim Underwood as Larry Underwood. That caused problems for Henson's process server. According to the processor server's affidavit, he arrived at Sheriff Jim Underwood's house and saw two "senior citizens" working in the yard. Then:

> I told [the male] that I had a summons and complaint for Larry Underwood, which I had assumed was [Sheriff Underwood's] nickname. He said he was not Larry Underwood. I told him that this summons and complaint was for him. In light of his age and the COVID-19 pandemic, and to avoid disturbing the peace, I told him that I was going to set the summons and complaint down on the bumper of his trunk where he could see them as I did so. I put the materials down on the bumper of his truck while he watched me and I left.

Sheriff Underwood argues that by misnaming him and by leaving the summons and complaint in a truck bed, the process server never perfected service under Federal Rule of Civil Procedure 4(e)(2). In response, Henson's brief passingly refers to the misnomer rule. *See Athmer v. C.E.I. Equip. Co. Inc.*, 121 F.3d 294 (7th Cir. 1997).

The Court is not prepared to rule on Sheriff Underwood's motion. The Court needs more briefing and more guidance from Henson. So, in an accompanying order, the Court will (a) moot the motion to dismiss as it currently exists and (b) direct Henson to move to amend her complaint and correctly name Sheriff Underwood. Her motion must (1) propose a remedy, including but not limited to reserving Sheriff Underwood; (2) further develop her misnomer rule arguments; and (3) make any relevant arguments under the relation-back doctrine. Sheriff Underwood will then have an opportunity to respond.

### E. Former Jail Administrator Trent McCluskey's Motion to Dismiss

Trent McCluskey's moved to dismiss on two grounds. He first moved to dismiss for insufficient process and insufficient service of process. He alternatively moved to dismiss under Rule 12(b)(6) for failure to state a claim.

The Court turns first to the service argument. A defendant may be served by "leaving a copy [of a summons and complaint] at the [defendant's] dwelling or usual

place of abode with someone of suitable age and discretion who resides there." Fed.
R. Civ. P. 4(e)(2)(B). According to McCluskey's affidavit, Henson's process server
left a summons and complaint at McCluskey's abode but *not* with a person of suitable
age and discretion. He says the process server left both documents at his front door
with no one. Henson never responded to McCluskey's affidavit and never filed an
affidavit of her own. She instead wrote: "Plaintiff is in the process of serving
McCluskey with an alias Summons and Complaint in order to moot [his] allegation."
Months have passed, yet there is no docket entry showing Henson ever requested an
alias summons or again attempted to serve McCluskey. In an accompanying Order,
the Court will hold McCluskey's motion to dismiss without ruling so to give Henson
fourteen days to perfect service.

At this time the Court need not address McCluskey's second argument.

## IV.   Conclusion

The Court will enter an Order consistent with this Memorandum of
Opinion.

**DONE** and **ORDERED** on December 7, 2020.

L. Scott Coogler
United States District Judge

203323

Page **24** of **24**